**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALBERT DIAZ LOPEZ,**

        **Petitioner,**

**-vs-**                                               **Case No. 6:07-cv-1717-Orl-31KRS**

**GUADALUPE RIOS ALCALA,**

        **Respondent.**

_____

## MEMORANDUM OPINION

This matter comes before this Court on a Petition (Doc. 1) filed by Petitioner Albert Diaz Lopez ("Lopez") on October 26, 2007, seeking the return of his two youngest children to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 ("ICARA") . This Court held an evidentiary hearing on this matter November 5, 2007[1], which was continued and concluded on February 28, 2008.

**I. Factual Background**

Lopez is a Mexican citizen and the ex-husband of Respondent Guadalupe Rios Alcala ("Alcala").[2] The couple have three children together: Getsemani, who is 13 years old; Sinai, who is 9 years old; and Suri, who is 7 years old. In Mexico, Alcala and Lopez lived with their children in

---

[1] The transcript of the portion of this hearing held on November 5, 2007 has been filed at Doc. 60 and will be cited herein as (Nov. Tr. at _).

[2] The couple was still married when the Petition was filed, but their divorce has since been finalized in Mexico.

a house that is attached to Lopez' parents' residence. Throughout the marriage Lopez has maintained steady employment working for the government.

In approximately July of 2003, Alcala moved out of the marital residence in Mexico and began renting an apartment nearby. For the next two years, the couple shared custody of all three children, with the paternal grandparents taking on significant care giving responsibility. Then, on October 29, 2005, Alcala took Sinai and Suri ("the children") to the United States, via Texas. Getsemani, however, remained in Mexico.

In January of 2006, Alcala moved to Florida with the children and they have been living in Altamonte Springs since that time. Alcala is presently working at a dry cleaners, and both children are enrolled in public school. The children have become conversant in English and are apparently doing well in school. Although Alcala and the children are illegal aliens, Respondent has filed petitions seeking asylum in the United States.

In response to Lopez's petition, Alcala argued, among other things, that the children should not be returned to Mexico because their father is an alcoholic and has been physically abusive to Alcala and the children in the past. Lopez denied these most of these allegations, but does admit to some "pushing back and forth" between him and Alcala in 2003. (Nov. Tr. at 27).

In the interest of resolving this matter without traumatizing the children by forcing them to testify, this Court ordered that the children be interviewed in a non-adversarial setting by a court-appointed child psychologist. Pursuant to that Order, Dr. Deborah Day interviewed both Sinai and Suri, provided this Court with written reports of her findings, and testified at the hearing held on February 28, 2008.

In their interviews with Dr. Day, both of the children stated that their father had hit them with his hand and a belt. They both also recalled him hitting and kicking their mother. Both children stated that they have seen Lopez drunk. While their statements in the interviews were mostly consistent, Dr. Day noted some indications that Suri may have been coached by her mother. However, Suri's fear that if she is returned to her father she will lose her mother and be exposed to physical discipline appear to be genuine. Sinai indicated a desire to spend time with his father, but also indicated that he does not trust him and did not want to return to Mexico. Sinai also indicated a desire to protect his mother from Lopez.

Lopez provided this Court with deposition testimony of two of his sisters and his mother (Docs. 57, 58 and 59), as well as the stipulated testimony of his 13 year-old daughter, Getsemani, all of whom live in the home adjacent to his and had regular contact with the children prior to October 29, 2005. All of these women denied any knowledge of abuse by Lopez, and testified that he was a loving father to all of his children. In contrast, these women accused Alcala of being verbally and physically abusive to the children.

## II. Standard of Review

> The Hague Convention mandates the return of children to their circumstances prior to the abduction if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention art. 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being exercised at the time of the removal or retention, or would have been exercised but for the removal or retention. Hague Convention art. 3; *Furnes*, 362 F.3d at 711; *Lops*, 140 F.3d at 936 (citations omitted). Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the

child's habitual residence; (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention; and (4) the child has not attained the age of 16 years. *Ruiz*, 392 F.3d at 1251; *Lops*, 140 F.3d at 936; *Pesin v. Rodriguez*, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999), appeal dismissed, 244 F.3d 1250, 1253 (11th Cir. 2001). If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned. *Lops*, 140 F.3d at 936 (citing 42 U.S.C. § 11601(a)(4)).

 The general rule that a wrongfully removed or retained child must be returned has six exceptions which excuse the return of the child. Hague Convention art. 12, 13, 20; *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1357-58 (M.D. Fla. 2002). A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that: (1) the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague Convention art. 13a; or (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention art. 13a; or (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13, unnumbered paragraph; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment." Hague Convention art. 12. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention art. 13b; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention art. 20. Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention. *England v. England*, 234 F.3d 268, 270-71 (5th Cir. 2000); *Friedrich*, 78 F.3d at 1067; *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3rd Cir. 1995).

*In re D.D.*, 440 F. Supp. 2d 1283, 1293-94 (M.D. Fla. 2006)(footnotes omitted).

**II. Legal Analysis**

*A) Wrongful Removal*

It is not disputed that the children's habitual state of residence is Mexico, that they are both under 16 years of age, and that their removal breached Lopez' custodial rights. However, Alcala argues that Lopez was not exercising his custodial rights at the time she took the children from Mexico.

The facts show that, at the time of the alleged abduction, the physical custody of the children was being shared between Lopez and Alcala. Respondent's argument that Lopez only picked the children up to take them to his parents house is without merit. Lopez and his parents lived in attached residences, and the fact that he sought their assistance in caring for his children does not negate his exercise of his custody rights.

Therefore, Petitioner has shown that the children were wrongfully removed under the Hague Convention.

*B) The Wishes of the Children*

Alcala first argues that the children should not be returned because they object to it and have "attained an age and degree of maturity at which it is appropriate to take account of [their] views." Suri is only 7 years old and therefore, this Court finds that she has not reached this age and degree of maturity.

Sinai, at 10 years old, has reached an age of such maturity.[3] However, his wishes with regard to this matter appear ambivalent. Sinai has expressed a desire to see and communicate with his father, but fears returning to Mexico primarily out of concern for his mother. The well-being of his mother should not be a child's concern. Furthermore, Sinai's fears are likely unfounded. For example, his return to Mexico does not mean he will never see his mother again, as she is free to return with him and seek custody rights through the Mexican courts. Moreover, because the parties are now divorced, Alcala will not be a member of Petitioner's household and less likely to be subjected to domestic violence.

---

[3] *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1362 (M.D. Fla. 2002))(finding that a child at age nine has reached an age of maturity such that his views should be considered).

Thus, while the Court has considered the stated wishes of the children, Respondent has not established this exception by a preponderance of the evidence.

*C) The Children's Adjustment to Their New Environment*

Alcala also argues that the children should not be returned because these proceedings were commenced more than one year after the date of the wrongful removal and the children are now settled in their new environment.

There is no question that this action was commenced more than one year after the wrongful removal of the children. Furthermore, Lopez admits that he has known the children were in central Florida since February of 2006 – well over a year before this petition was filed. (Doc. 1 at 5).[4] Therefore, the doctrine of equitable tolling does not apply. Thus, the Court must determine whether the children are settled in their new environment.

> [C]ourts have considered the following factors in determining whether a child is settled in a new environment: (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the mother's employment; and (6) whether the child has friends and relatives in the new area. *In re Koc*, 181 F. Supp. 2d at 152; *Gitter*, 2003 U.S. Dist. LEXIS 21015, 2003 WL 22775375, at *5; *Anderson v. Acree*, 250 F. Supp. 2d 876, 881 (S.D. Ohio 2002). However, a more comfortable material existence is not dispositive of the child being settled. *Lops*, 140 F.3d at 946. In fact, *Lops* directs courts to look beyond a comfortable material existence and to consider the child's living environment, the involvement of the parents, active measures taken to conceal the child's whereabouts, and the possibility of prosecution for conduct concealing the child. *Lops*, 140 F.3d at 946. Additionally, the uncertain immigration status of a parent and her child is a factor suggesting that a child is not settled. *In re Koc*, 181 F. Supp. 2d at 154.

*In re Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004).

---

[4] At the hearing on February 28th, Lopez also testified that he knew Alcala's central Florida address in March of 2006, and later testified that he did not find out until the first week of May, 2006. In any event all of these dates are more than one year prior to the filing of the petition.

The evidence shows that the children are doing well in their new environment. They both have adjusted to their school, made friends, and learned English. However, since they came to the United States they have moved around quite a bit. The children did not move to central Florida until January, 2006 and have been at their current residence for less than a year.

It has also been established that the children have established a close relationship with their maternal grandmother and an uncle. However, they have done so at the cost of their relationship with their father, their sister, Getsemani, as well as their paternal grandparents and aunts.[5]

Finally, their residence in this country is not stable because neither Alcala nor the children have legal alien status and, as such, are subject to deportation at anytime.[6]

Thus, this Court finds that Respondent has failed to establish this factor by a preponderance of the evidence.

*D) Risk of Harm to the Children*

Finally, Alcala argues that there is a grave risk that the children's return would expose them to physical or psychological harm or otherwise place them in an intolerable situation.

> This exception . . . requires evaluation of the grave risk of physical harm to the children, psychological harm to the children, or if return would otherwise place the children in an intolerable situation. Like the other exceptions, this is a narrow exception. *England*, 234 F.3d at 270-71; *Whallon*, 230 F.3d at 459; *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374 at 376.
>
> . . . .

---

[5]In fact, Alcala has intentionally sought to prevent the children from having any relationship with their father.

[6]Alcala has applied for asylum status on behalf of herself and the children, however these applications have not been approved and do not appear meritorious

> This exception requires the alleged physical or psychological harm to be "a great deal more than minimal." *Whallon*, 230 F.3d at 459, quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). Only severe potential harm to the child will trigger this Article 13b exception. *Nunez-Escudero*, 58 F.3d at 377, quoting the Supreme Court of Canada, *Thomson v. Thomson*, 119 D.L.R. (4th) 253, 286 (Can. 1994).

*Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002).

> After examining the text of the Convention and cases from a range of other countries, the Supreme Court of Canada concluded that only severe potential harm to the child will trigger this Article 13b exception:
>
>> In brief, although the word "grave" modifies "risk" and not "harm," this must be read in conjunction with the clause "or otherwise place the child in an intolerable situation." The use of the word "otherwise" points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation.
>
> *Thomson v. Thomson*, 119 D.L.R.4th 253, 286 (Can. 1994). *See also In re A. (A Minor)*, [1988] 1 F.L.R. 365, 372 (Eng. C.A.) (abducting parent must prove grave risk of harm that is "something greater than would normally be expected on taking a child away from one parent and passing him to another"). We should give considerable weight to these well-reasoned opinions of other Convention signatories. *See Air France v. Saks*, 470 U.S. 392, 403, 84 L. Ed. 2d 289, 105 S. Ct. 1338 (1985); 42 U.S.C. § 11601(b)(3)(B) (recognizing "the need for uniform international interpretation of the Convention"). . . . The Article 13b inquiry does not include an adjudication of the underlying custody dispute, *Rydder*, 49 F.3d at 372, and only requires an assessment of whether the child will face immediate and substantial risk of an intolerable situation if he is returned to Mexico pending final determination of his parents' custody dispute.

*Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995).

> The United States Department of State has stated that an "intolerable situation" under Article 13b was not intended to encompass situations such as return to a home where money is in short supply, or where educational or other opportunities are more limited than in the new country. It gave as an example of "intolerable situation" where the custodial parent sexually abuses a child. 51 Fed.Reg. at 10510.

*Mendez Lynch*, 220 F. Supp. 2d at 1364.

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those

-8-

> situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13b; the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2nd Cir. 2001).

The only evidence of abuse is the testimony of Alcala, and the few anecdotes provided by the children. Alcala's testimony has been rebutted by Lopez, his mother, his two sisters and the couple's 13 year-old daughter, Getsemani. Sinai's testimony that he witnessed Lopez hit Alcala on two occasions and Suri's representations to Dr. Day, while considered by this Court, do not rise to the level of clear and convincing evidence.

Dr. Day testified that, while she did not think that all of the children's statements were the result of coaching, she also recognized that her findings were limited due to a lack of background information. Dr. Day further testified that the children may be more susceptible to coaching or suggestion because they are motivated to stay in the United States with their mother. Both children fear that if they go back to Mexico they will never see their mother again. This is a strong motivation for them to do whatever they can to stay in the United States. Moreover, it appears to this Court that Sinai feels an obligation to act as the "man of the family" and take care of his mother. This provides further motivation to support his mother's stories. Finally, Sinai's testimony that he remembers an incident of domestic violence that occurred "after [American] Thanksgiving in 2003", when he was only five years old, is suspect.

Even if this Court took all of the children's testimony as true, it does not rise to the level of an intolerable situation. Sinai indicated that his father hit him twice, and that he never saw his father hit Suri. Suri told Dr. Day that her father had hit her once or twice as well. This evidence only indicates that Lopez has used corporal punishment to discipline the children in the past.

However, the possibility of such punishment being inflicted immediately upon the children's return is uncertain. Furthermore, there is no objective evidence of serious abuse by Lopez. Ultimately, the alleged abuse in this case is not so severe that it rises to the level of an intolerable situation. Thus, this Court must order that the children be returned to Mexico, where custody will be determined by the Mexican courts.

**IV. Conclusion**

Accordingly, the Petition will be granted and a separate Order will be entered delineating the time and manner in which the children shall be returned to their father, Alberto Diaz Lopez, in Tejupilco, Mexico.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 29, 2008.

Copies furnished to:

Counsel of Record

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE